[No. 1619.]

GEORGE H. WEDEKIND, RESPONDENT, v. C. B. BELL
AND W. A. SLEEP, APPELLANTS.

ACTION—SETTLEMENT—APPEAL—DISMISSAL. 1. A conveyance by plaintiff of all his interest in the subject of the action to a third party, and settlement pending appeal, between the latter and the defendant, in which it is agreed that the settlement shall not be affected by the judgment on appeal, is a settlement of the entire controversy.

2. Where the parties to an appeal settle the controversy, the appeal will be dismissed though the cause has been argued and submitted.

APPEAL from the Second Judicial District Court, Washoe County; *G. F. Talbot*, Judge presiding.

Action by George H. Wedekind against C. B. Bell and others. From a judgment for plaintiff, defendants appeal.
**Dismissed.**

[NOTE—Owing to the importance of the issues involved in this case, salient points on the main issues are given from certain of the briefs. Other briefs were filed, but subsequently withdrawn, and such, and replies thereto, are, of course, not given. EUGENE HOWELL, Clerk of the Supreme Court, and ALFRED CHARTZ, Reporters.]

*Thos. S. Ford* and *Benj. Curler*, and *W. A. Sleep, in pro. per.*, for Appellants:

### STATEMENT OF FACTS.

The complaint in this action contains two counts—one for ejectment, and one for an injunction.

The case was brought in Washoe county by plaintiff Wedekind, to recover possession of a portion of an alleged mining location called the Safeguard Mining Claim.

This mining location ran diagonally northwest and southeast, across the corner common to sections 28, 29, 32 and 33, township 20 north, range 20 east, situated about four miles north of Reno.

The center of the alleged location was laid in section 28, and as described in the complaint. A triangular piece of said location—about $1\frac{1}{2}$ acres—was included within section 32. Another triangular piece—about $2\frac{3}{4}$ acres—was included within section 28. The balance of the location was included within sections 29 and 33.

The complaint alleged that defendants had entered upon the ledge of the Safeguard, within the confines of section 32, and had mined thereon, and ousted plaintiff from a portion of said ledge and asked for the recovery of possession, and an injunction.

Defendants Bell and Sleep, the only real persons named in the complaint, answered the complaint, denying all the material allegations of the complaint, except their possession of a portion of section 32, and this portion, owned and occupied by them, was the land affected by the controversy.

The answer also interposed a special defense, to wit: That long prior to the discovery of any mineral in said neighborhood, in 1881, James Conroy had entered the northeast quarter of section 32, under the desert land act of Congress, and had paid for the land in that year (1881), receiving his certificate of payment, and thereby making him the equitable owner thereof. That in 1890 the government had issued its patent for the land; that Conroy had died; that prior to his death he had filed a homestead thereon, under state law; that after his death the land had been set aside by judgment of the probate court to his surviving widow, Delia Conroy, and that Delia Conroy had conveyed to defendant Bell. It is also alleged that in the year 1876 (long prior to the discovery of mineral) section 33 had been patented by the government to

the Central Pacific Railroad Company, a corporation; that the corporation had conveyed the land to one Frazer; that Frazer had conveyed said section 33 to plaintiff Wedekind, prior to the time he made his mining location. The answer also alleged that section 29 was unpatented railroad land.

It will thus be seen that, upon the pleadings and judgment roll, the question was squarely presented, whether plaintiff could locate patented government land, containing a ledge having an apex thereon, and follow the ledge into adjoining agricultural ground, both patents having been granted prior to the discovery of mineral. This was especially true, as on the trial the evidence showed that plaintiff's works and improvements were on 33, and defendants' works and improvements were on 32 and the alleged ledge, running from 33 to 32.

During the progress of the trial in the court below, the plaintiff amended his complaint by alleging that that portion of the Safeguard ledge which entered 32 had its apex upon 33. This narrowed the issue upon this question to this precise point, and the only claim by plaintiff was that a mining location, under the laws of Congress, could be made upon private patented land, and the ledge followed by the locator into adjoining patented land.

The Safeguard location was made April 10, 1901, and on April 15th the complaint was filed, and a temporary restraining order issued against defendants. About one month thereafter the matter was heard by the lower court upon the question whether a temporary injunction should be issued pending the trial. This hearing necessarily involved the merits, and the injunction was denied. Thereafter the case came regularly on for trial before Judge Talbot, and upon the trial of the case judgment was given in plaintiff's favor.

This judgment is to the effect that there is a ledge upon the Safeguard, having its apex in section 33, which enters section 32; that the plaintiff is the owner of this ledge, and can follow it into 32, and oust the defendants from the ledge, giving it to plaintiff, and restrains defendants from working it.

But the judgment also decrees that defendants are the owners of the surface of section 32 and all mineral and ledges in 32, except the Safeguard ledge, which has its apex in 33.

Thereafter, due proceedings were had on motion for a new trial, which motion was overruled, and this appeal is taken from the judgment and order overruling the motion for a new trial.

ARGUMENT FOR APPELLANTS.

I. Even if section 33 had been public mineral land of the United States, upon which a mining location could be made, the plaintiff could not follow his ledge under a prior agricultural patent in section 32. It has been so held. (*Amador Medean G. M. Co.* v. *South Spring Hill G. M. Co.*, 36 Fed. 668, 13 Saw. 523; *Pacific Coast M. & M. Co.* v. *Spargo*, 16 Fed. 348, 8 Saw. 647.)

II. The common-law rule governs mining land. In the court below respondents claimed that Mr. Lindley, in his work on mines, disapproved of Judge Sawyer's reasoning in the case of *Amador* v. *South, etc.*, 8 Saw. 523, to the effect that the right to follow a vein is an easement, Mr. Lindley claiming that it is an estate in adjoining land. (Lindley on Mines, vol. 2, sec. 612, p. 761.) But Mr. Lindley's views are not approved by the courts. But the question is fully discussed in the case of *Duggan* v. *Davey*, 26 N. W. R. 890-3, and the conclusion is reached that the owner of a mining claim owns everything from the boundary lines down vertically to the center of the earth—subject to the right of his adjoining mine owner to follow his ledge, and with the right to follow his own ledge beyond his side lines, into his adjoining mine owner. That case is approved and commented on by Judge Ross in *Doe* v. *Waterloo*, 54 Fed. Rep. 937; approved also in 16 Fed. 348, and 36 Fed. 668.

III. In the case of *Stanley* v. *Mineral Union*, 26 Nev. 64, where a similar question is raised, Justice Massey, speaking for the court, says: "A large number of authorities are cited by the appellant to support this contention, and, in a proper case, would control, but as the cases cited do not, as we believe, apply to the case at bar, we do not deem it necessary to disscuss or review them. The question must be determined, as we view it, by the application of certain statutory rules, the enactment of our legislature." That is to say, where the right is claimed to locate mineral upon state lands, it is simply a question of what the state legislature has

enacted. But where the party claims the grant direct from Congress the state enactments have no application. We deem the present action "a proper case," within the meaning of that decision, wherein the adjudicated cases are applicable.

IV. In the eye of the law, sections 32 and 33 contain no mineral or ledges; the law does not recognize proof that such mineral exists, after the patents have been exhibited in evidence. (*Standard Quicksilver Co.* v. *Habisha*, 132 Cal. 115; *Wormouth* v. *Gardner*, 112 Cal. 510; *Cowell* v. *Lammers*, 21 Fed. Rep. 206; *Richards* v. *Dower*, 81 Cal. 54; *Iron Silver Co.* v. *Mike & Starr Co.*, 143 U. S. 404; *Eureka Case*, 4 Saw. 320.)

V. The United States Supreme Court said, in *Deffebeck* v. *Hawke:* "If, upon the premises at that time there were not actual 'known mines,' capable of being profitably worked for their product so as to make the land more valuable for mining than for agriculture, a title to them acquired under the preemption act cannot be successfully assailed." (*Cole* v. *United States*, 123 U. S. 307, 326; *Richards* v. *Dower*, 81 Cal. 44; *U. S.* v. *Reed*, 28 Fed. 482; *Gold Hill* v. *Ish*, 5 Or. 104; *In re Abercrombie*, 6 L. D. 393; *Bellows* v. *Champion*, 4 Copp's L. O. 17; *Nancy Ann Case*, 3 L. D. 169; *Hamish* v. *Wallace*, 13 L. D. 108.) It is a general rule, applicable to all classes of grants, that the subsequent discovery of mineral cannot affect the title as it passed at the time of the grant. (*Davis* v. *Wiebold*, 139 U. S. 507; *Deffebeck* v. *Hawke*, 115 U. S. 404; *Hunt* v. *Steese*, 75 Cal. 620; *Richards* v. *Dower*, 151 U. S. 658; *Smith* v. *Hill*, 89 Cal. 122.) Discoveries made after title has passed from the United States, by which the land becomes profitable to work as a mine, cannot affect the title. (*Colorado Co.* v. *United States*, 123 U. S. 307; *Deffebeck* v. *Hawke*, 115 U. S. 392.) Where certificate of final agricultural entry has been issued, no subsequent discovery of mineral can defeat the title of the holder. (*Arthur* v. *Early*, 21 L. D. 92; *Ray* v. *Stevenson*, 15 L. D. 37.)

VI. Even if section 33 were government land of the United States, subject to location under the mineral laws, and plaintiff had a ledge or surface apex, he could not dip under section 32, when the latter section was not known to contain mineral the time the patent was issued. The point has been clearly and definitely settled by two decisions of

high authority: *Amador* v. *South Spring Hill,* 36 Fed. 668; *Pacific Coast* v. *Spargo,* 16 Fed. 348.

VII.   In all of the following cases attempts were made to locate mines upon patented ·ground, or beneath patented ground, where a railroad, town site, or agricultural patent had been granted, and in each and every case the court held against the mineral claimants.   (*Carter* v. *Thompson,* 65 Fed. 329; *Buena Vista* v. *Solari,* 67 Fed. 226; *Dower* v. *Richards,* 151 U. S. 653; *Richards* v. *Dower,* 81 Cal. 44; *Gale* v. *Best,* 73 Cal. 235; *Smith* v. *Hill,* 89 Cal. 122; *McCormick* v. *Sutton,* 97 Cal. 573; *Cowell* v. *Lammers,* 21 Fed. 200; *Pacific Coast* v. *Spargo,* 16 Fed. 348; *Standard Co.* v. *Habishaw,* 132 Cal. 115; *Railroad Co.* v. *Whitney,* 132 U. S. 357; *Railroad Co.* v. *Dunmeyer,* 113 U. S. 629; *Carroll* v. *Safford,* 3 How. 441; *Witherspoon* v. *Duncan,* 4 Wall. 218; *Wilcox* v. *Jackson,* 13 Pet. 513.)

VIII.   It is a well-settled principle of law that the decisions of the land department, upon questions of fact, are conclusive when brought to notice in a collateral proceeding. (*Shepley* v. *Cowell,* 91 U. S. 330; ·*Quinby* v. *Connelly,* 104 U. S. 427; *U. S.* v. *Budd,* 144 U. S. 168; *Johnson* v. *Cowsley,* 13 Wall. 72; *Warren* v. *Van Brunt,* 19 Wall. 648; *Moore* v. *Robbins,* 96 U. S. 530.)

IX.   Only unoccupied and unappropriated mineral lands of the United States are open to exploration and survey.   (*Armstrong* v. *Lower,* 6 Colo. 393; *Henshaw* v. *Clark,* 14 Cal. 461; *Soggs* v. *Merced,* 14 Cal. 279; *U. S.* v. *Castilero,* 2 Black. 717; 3 Wall. 304.)   The land patented to the C. P. R. R. Co. was private land, and the exemption of mineral in that grant, as well as others, must be determined by the law, and not by the clauses inserted in the patent.   This question is reviewed in *Cowell* v. *Lammers,* 21 Fed. 200, and in that case it is held that the clause in the railroad patent, excluding all mineral lands, "should any such be found to exist," is void.   The railroad company could not have acquired any extralateral rights under the mineral laws, after the patent had been issued, and their grantees are in no better position.

X.   The issuance of the first patent is a conclusive adjudication that there is no mineral beneath the surface, and that the patent is conclusive of the fact, and binding on the

·courts. (*Gale* v. *Best*, 78 Cal. 235; *Irvine* v. *Talbot*, 105 Cal. 237; *Dreyfuss* v. *Badger*, 108 Cal. 65; *French* v. *Fyan*, 93 U. S. 169; *Johnson* v. *Towsley*, 13 Wall. 72; *Moore* v. *Roberts*, 96 U. S.; *St. Louis Co.* v. *Kemp*, 104 U. S. 636; *Steel* v. *Smelting Co.*, 106 U. S. 447; *Butte* v. *Sloan*, 40 Pac. 217; *Perley's Park* v. *Kerr*, 130 U. S. 256; *Dahl* v. *Ramheim*, 132 U. S. 260.)

XI.   It is a well-settled principle of law that no rights to mineral land can be initiated by trespass. (*Cowell* v. *Lammers*, 21 Fed. 203; *Atherton* v. *Fowler*, 96 U. S. 513; *Hosmer* v. *Wallace*, 97 U. S. 579; *Quinby* v. *Conlan*, 104 U. S. 421; *Dole* v. *Meador*, 16 Cal. 320.)

XII.   A mining claim, in actual possession of the claimants, is valid, irrespective of the mining laws. (*Campbell* v. *Rankin*, 99 U. S. 262; *English* v. *Johnson*, 17 Cal. 107; *Rogers* v. *Cooney*, 7 Nev. 219; *Table Mt.* v. *Stranahan*, 20 Cal. 209; *Hess* v. *Winder*, 30 Cal. 355; *North N. M. Co.* v. *Orient M. Co.*, 11 Fed. 128.)

*W. E. F. Deal*, of Counsel, for Appellants:

I.   The United States land office did, on or prior to the issuance to James Conroy of the register's receipt on January 3, 1881, determine and decide that the northeast quarter of section 32, township 20, was non-mineral land subject to purchase and sale, and this decision is such a conclusive adjudication of the character of the land that no court can or will question it, it being a determination of a question of fact within the jurisdiction of the land office exclusively.

II.   "When the law has confided to a special tribunal the authority to hear and determine certain matters arising in the course of its duties, the decision of that tribunal, within the scope of its authority, is conclusive upon all·others." (80 U. S. p. 83; *French* v. *Fyan*, 93 U. S. 171; *Smelting Co.* v. *Kemp*, 104 U. S. 465; *Steel* v. *Smelting Co.*, 106 U. S. 451; *Baldwin* v. *Stark*, 107 U. S. 465; *Iron S. M. Co.* v. *Campbell*, 107 U. S. 303; *Heath* v. *Wallace*, 138 U. S. 585; *U. S.* v. *California Land Co.*, 148 U. S. 44.)

III.   A complete title in fee simple passed to James Conroy and heirs to the northeast quarter of section 32 on February 11, 1890, when the patent was signed and recorded in the department of the interior at Washington City. (*Houghton*

v. *Harding*, 53 Cal. 181; *Cruz* v. *Martinez*, 53 Cal. 239;·
*Ellzrath* v. *Ryan*, 89 Cal. 188; *Teschmeyer* v. *Thompson*, 18
Cal. 11; *U. S.* v. *Schurz*, 102 U. S. 378.)

IV. The patent to James Conroy contained the following
reservations: "Subject to any vested and accrued water
rights for mining, agricultural, manufacturing, or other pur-
poses, and rights to ditches and reservoirs used in connection
with such water rights as may be recognized and acknowl-
edged by the local customs, laws and decisions of courts,
*and also subject to the rights of the proprietor of a vein or
lode to extract and remove his ore therefrom, should the same
be found to penetrate or intersect the premises hereby granted,
as provided by law.*" The reservation emphasized commenc-
ing with the words "and also" is absolutely null and void,
as it was wholly unauthorized by the act under which the
land was entered and purchased. (*Deffeback* v. *Hawke*, 115
U. S. 406; *Davis* v. *Weibold*, 139 U. S. 528; *Shaw* v. *Kellog*,
170 U. S. 338.) The Supreme Court of the United States has
never changed or modified the principles established by the
above authorities, as they clearly point out in *Shaw* v. *Kellog*
in discussing the opinion rendered by that court in the case
of *Barden* v. *Northern Pacific R. R. Co.*, 154 U. S. 288. They
say: "But there was no division of opinion as to the ques-
tion that when the legal title did pass, and it passed unques-
tionably by the patent—it passed free from the contingency
of the future discovery of mineral." (*Shaw* v. *Kellog*, 170
U. S. 339.) To use the language of the Supreme Court of
the United States in *Shaw* v. *Kellog*, page 339, the title
"passed free from the contingency of future discovery of
minerals."

*Bigelow & Dorsey*, for Respondent:

I. It seems to be well and firmly settled that possession of
the surface where a vein apexes is possession of the whole
vein, and will support an action for trespass upon the vein
after it has passed through the side lines. (*Montana M. Co.*
v. *St. Louis M. Co.*, 102 Fed. 430, 435; *Bullion M. Co.* v.
*Crœsus M. Co.*, 2 Nev. 168, 178; *Hyman* v. *Wheeler*, 29 Fed.
347; *Pardee* v. *Murray*, 2 Pac. 16, 4 Mont. 234; *Mining Co.*
v. *Cheeseman*, 116 U. S. 533.)

II.   The owner of a mine in the lands of another has a right to enter and work them, "without the concurrence of the owner of the surface," and that no trespass is thereby committed.   (Rockwell, 520; *Earl of Cardigan* v. *Armitage*, 2 Ban. & Cres. 197; 3 Dumford & East, 414.)

III.   A location of a mining claim by an alien is free from attack from anyone except the government, and he may hold his interest as against all the world save the United States after ore is found.   (*McKinley Creek M. Co.* v. *Alaska United M. Co.*, decided January 6, 1902, advance sheet Sup. Ct. Rep. Jan. 15, 1902; *Tornanses* v. *Melsing*, 109 Fed. 710; *Billings* v. *Aspen M. Co.*, 51 Fed. 338, 344; 52 Fed. 250–1; *Lone Jack M. Co.* v. *Megginson*, 82 Fed. 89, 93; *Wilson* v. *Triumph Con. M. Co.*, 56 Pac. 300–2; *Manuel* v. *Wulff*, 152 U. S. 505; *Crœsus M. Co.* v. *Colorado Co.*, 19 Fed. 78, 82; *Ferguson* v. *Neville*, 61 Cal. 356, 359; *Cornian M. Co.* v. *Alexander*, 2 So. Dak. 557; 51 N. W. 346; *Wulff* v. *Manuel*, 9 Mont. 274; 23 Pac. 723; 1 Lindley on Mines, sec. 234.)

IV.   We claim that lodes or veins, having their apex outside of the agricultural grant are (to the extent that such lodes or veins,- on their course downward underlie it) reserved by law out of such grant.   Nor does this doctrine militate against the rule of law we may admit as established, that the patent is conclusive evidence of the character of the land.   The land covered by the agricultural patent may be conclusively deemed to be agricultural, but this does not imply that a lode under its surface, apexing outside of it, cannot be reserved without impeaching the patent and changing the legal character of the land.   The two titles—that of the vein and that of the agricultural surface—may coexist without conflicting in a legal sense.

V.   The appellants have no title to the segment of the vein beneath the surface of section 32 because its apex lies wholly within respondent's premises.   (*Tyler M. Co.* v. *Last Chance M. Co.*, 71 Fed. 848; *Tyler M. Co.* v. *Sweeney*, 54 Fed. 292; *Last Chance M. Co.* v. *Tyler*, 61 Fed. 564; *Consal Wyoming M. Co.* v. *Champion*, 63 Fed. 541, 546; *Del Monte M. Co.* v. *New York*, 66 Fed. 212; *Fitzgerald* v. *Clark*, 42 Pac. 73.)   All these authorities hold that "if there is any right emphatically granted by the mining laws, it is one in

direct contravention of the common law." See, also, *Jones* v. *Prospect Mountain Tunnel Co.*, 21 Nev. 339; *Roxina G. M. & T. Co.* v. *Cone*, 100 Fed. 168; *Driscoll* v. *Dunwoody*, 16 Pac. 726; *Montana Co.* v. *Clark*, 42 Fed. 626; *Reynolds* v. *Iron Silver M. Co.*, 116 U. S. 687, which case at page 690 says: "Whether the defendant has title or is a mere trespasser, it is certain that he is in possession, and that is a sufficient defense against one who has no title at all and never had any."

VI. It is too plain to require argument that the general policy of the government has been to reserve mines from the operation of all grants of land west of the one hundredth meridian, whether to the several states, in aid of the construction of railroads, or under any of the settlement acts. "The uniform reservation of mineral lands from survey, from sale, from preemption and from all grants, whether for railroad, public buildings or other purposes, fixed and settled the policy of the government in relation to such lands." (1 Lindley on Mines, sec. 47.) As the paramount proprietor, with all the rights of dominion and powers of alienation that are incident to absolute ownership in individuals (*Lux* v. *Haggin*, 69 Cal. 225), the government has adopted, prescribed and authorized the fixing of rules which sanction and regulate the acquisition and enjoyment of mineral lands and mining right. Those rules originated in and are evidenced and expressed by: 1—Local rules and customs; 2—State legislation; 3—Acts of Congress.

VII. Now, what objection, on principle, can there be to the doctrine of the cases we have referred to on this branch of the case? Under the law of Congress, the right of the owner of even a lode mining claim is expressly restricted to such veins, lodes or ledges as have their tops or apexes inside of the surface lines of their claims extended vertically downward. The grant is only of the veins which have their tops within the claim; it excludes all veins or lodes which have their tops outside of the claim, although in their depths they enter such ground. Such being the law applicable to lode claims, *a fortiori*, is it the law as applied to agricultural land? Certainly there is greater room for contending that a lode passes to the mining than to the agricultural applicant for

patent. Assuredly there is more reason for contending that the patentee of a mining claim (whose sole object in obtaining his title was to get, and the only value of whose ground lies in, the precious metals from the veins discovered therein) is entitled to such veins where they are not owned by some other locator or patentee, than there is for holding that the patentee of agricultural lands (sold and bought for agricultural purposes alone, upon presumption and under sworn proof that they were non-mineral in character) is entitled to any vein apexing elsewhere. To put it otherwise, it is apparent that the substance of the grant of mineral lands, is the mineral—the ore beneath the surface (*Calhoun G. M. Co.* v. *Ajax G. M. Co.*, advance sheets U. S. Sup. Ct. Rep. July 1, 1901, p. 890; *Johnson* v. *Parks*, 10 Cal. 447), while the reverse is the case in respect to agricultural lands, where the surface is the principal thing, and yet, as we have shown, the courts hold, as between mineral claimants, that the mere possession of an apex, without extralateral right, without any title, may follow the vein beneath the mining patent. Then why not beneath the agricultural grant? The reason of the matter lies in the fact that the vein is an entity—it is an entire thing. Something must fix and determine its ownership or possession. That something has been made, by custom, rule and legislation, its apex. Whoever own that, or is in possession of that, is entitled to its extralateral pursuit. When a tract of land is located or sold the government retains the ownership of, and complete control over, all veins which apex elsewhere, and nothing can be clearer than that the grantee of the government should succeed to its rights and titles in this regard.

VIII. Our examination of the questions involved in the case at bar has developed the fact that counsel engaged in the trial of such cases, and courts in deciding them, while discussing the incidents of the ownership of veins, or of land containing them, frequently refer to the common-law rule of *usque ad coelum et ad orcum*, and draw the conclusion that our mining customs and laws, which award the right to pursue veins from their apexes beyond the vertical planes drawn through surface boundaries, are in contravention of the common law. "Strictly speaking, this is inaccurate. The grant

of the right of lateral pursuit is, in legal effect, a severance
of the estate in the vein from the ownership of the soil into
which it penetrates after passing beyond the vertical planes
drawn through the surface boundaries of the location or
patent. The government being the owner of the fee may
carve from it the ownership of the vein. It may grant the
surface to one and the vein to another. There was nothing
in the common law which prohibits this severance. In fact,
it was expressly sanctioned. Instead of being in derogation
of the common law, this class of grants is in absolute har-
mony with it. * * * This dip or extralateral right is not
a mere easement. The estate thus granted in the vein is of
the same dignity as that of a title in fee. It is a title in fee
as to the vein granted." (2 Lindley, sec. 568.) That's the
point—the sword which severs the Gordian knot. The estate
in the vein, when obtained by location or possession of the
apex, is in the nature of, and when obtained by ownership of
the ground embracing the apex is absolutely, a fee simple
estate in an entire thing.

IX. Of course the appellants take refuge behind the doc-
trine that the issuance of patent is a conclusive determina-
tion by the government that the land is agricultural, and that
it is not competent to reopen the question of the character of
the land. In *Smelting Co.* v. *Kemp*, 104 U. S. 636, the court
says, on page 646: "A patent, in a court of law, is con-
clusive of all matters properly determinable by the land
department. * * * Indeed the doctrine as to the regu-
larity and validity of its acts, where it has jurisdiction, goes
so far that if, in any circumstances under existing law, a
patent would be held valid, it will be presumed that such
circumstance existed." (*Gale* v. *Best*, 78 Cal. 240; *Peabody
Gold M. Co.* v. *Gold Hill M. Co.*, 111 Fed. 817–819.) As said
in *Gale* v. *Best*, 78 Cal. 235, by the court, on page 241: "It
was a part of the description of the land conveyed, and it
may be strongly argued that, in such case, although it was
the duty of the land department to determine the character
of the land before the issuance of the patent, yet, as the
patent shows upon its face that such duty was not performed,
the patentee must be held to have taken knowing its uncertain
and unsubstantial character." In *Reynolds* v. *Iron Silver M.*

*Co.*, 116 U. S. 687, the court, on page 607, said: "Without deciding on the effect of the acceptance without protest of a patent, with such exceptions in the granting clause, where their execution is the voluntary act of the officers who execute the instrument, it is sufficient to say that these conditions but give expression to the intent of the statute."

X.   We claim that (*a*) by the common law of England, mines of precious metals by grant from the sovereigns never passed unless expressly mentioned and expressly provided. (*b*) There is no national common law.   (*c*) The doctrine of intralimital rights is repugnant to and inconsistent with the mining customs and laws of the State of Nevada.   (*d*) That the construction, force and effect of patents must be had and determined under and according to the laws of the state where the real estate is situated.

XI.   "The right of property in all mines of gold and silver within the realm, whether they be in the lands of the crown or of the subject, is vested, *prima facie*, in the crown by prerogative."   (*Case of Mines*, Plowd. 236; *Case of Saltpetre*, 12 Rep. 12; Bainbridge on Mines, pp. 4, 31, 32, 33, 34, 35; *Moore* v. *Smaw*, 17 Cal. 220.)

XII.   There is no national common law; though, herein, each state has its own common law.   (*Wheaton* v. *Peters*, 8 Pet. U. S. 658; *Smith* v. *Alabama*, 124 U. S. 478; *U. S.* v. *Reed*, 53 U. S. 12 How. 363; *Forepaugh* v. *Delaware R. R. Co.*, 15 Am. St. 674.)

XIII.   In *Lilliebridge* v. *Lackawanna Coal Co.*, 143 Pa. St. 293, the court held that: "We have for nearly half a century judicially regarded the ownership of mineral, where it has been severed from the surface, as the ownership of land, to all intents and purposes."   (*Caldwell* v. *Copeland*, 37 Pa. St. 427; *Scranton* v. *Phillips*, 94 Pa. St. 15; *Sanderson* v. *Scranton*, 105 Pa. St. 460; *Delaware R. R. Co.* v. *Sanderson*, 109 Pa. St. 583; *Williams* v. *Gibson*, 84 Ala. 228; *Marvin* v. *Brewster*, 55 N. Y. 538; *Rickman* v. *Gillis*, 57 N. Y. 68; *Benavides* v. *Hunt*, 69 Tex. 383; *Silva* v. *Rankin*, 80 Ga. 79; *Knight* v. *Indiana Co.*, 47 Ind. 105; *Arnold* v. *Stevens*, 24 Pick. 106; *Hartwell* v. *Camman*, 10 N. J. 128; *Massot* v. *Moses*, 3 S. C. 168.)

XIV.   The Supreme Court of the United States gave full

recognition to the binding force of the local rules, regulations, usages and customs before the sanction of federal statutory enactment, and to the doctrine that they constitute the American common law of mines. (*Sparrow* v. *Strong*, 3 Wall. 97, decided in 1865; *Jamison* v. *Kirk*, 98 U. S. 453, decided in 1878; *King* v. *Edwards*, 1 Mont. 239; *Atchison* v. *Peters*, 20 Wall. 510.) And that doctrine has been approved and adopted as the law of Nevada. (*Reno Works* v. *Stevenson*, 20 Nev. 274.)

XV. In *United States* v. *Douglas-William Sartoris Co.*, 2 N. Y., the court, on page 293, says: "It is no longer a question open to dispute that, when the government becomes a party to a contract between itself and its citizens, it divests itself of its sovereignty in respect to the terms and conditions of the contract, its construction and interpretation, and stands in the same position with reference to the contract as a private individual." (Citing *Com.* v. *Proprietors*, 2 Gray, 350; Hamilton, Works, vol. 3, p. 518; *Biddle Boggs* v. *Merced M. Co.*, 14 Cal. 376.) It is perfectly clear that no title to lands can be acquired or passed unless according to the laws of the state in which the same are situate. (*Clark* v. *Graham*, 6 Wheat. 579; 3 Washburn on Real Property, 238.) It is a principle firmly established, says the Supreme Court in *DeVaughan* v. *Hutchinson*, 165 U. S. 570. (*U. S.* v. *Crosby*, 7 Cranch, 115; *Clark* v. *Graham*, 6 Wheat. 577; *McGood* v. *Scales*, 9 Wall. 23, *Brine* v. *Ins. Co.*, 96 U. S. 627; *Jones* v. *Habersham*, 107 U. S. 174; *Moseby* v. *Burron*, 52 Tex. 396; *Osborne* v. *McCartney*, 121 Ill. 408.)

*Thos. Wren*, also for Respondent:

I. It goes without saying that the Supreme Court of the United States will, upon the authorities cited, adopt the decisions of this court settling the extralateral rights of miners under the statutes of this state, and of the United States, and the common law established by the universal custom of the miners on this coast, giving extralateral rights, for more than fifty years, and in Nevada from the meeting of the first legislature after its organization as a territory, and continued and enlarged by state legislation ever since the admission of the state into the union.

II. Logically, when the common law was adopted by the legislature of the Territory of Nevada and subsequently by the state legislature, it was adopted subject to the rules, regulations and customs of the miners, and those laws, regulations and customs have continued in force ever since, and are now in force in this state, unless they have been in some way modified or abolished by state or national legislation.

III. "The intent of the legislature controls the court not only in the construction of an act, but also in determining whether a former law is repealed or not." (*Thorp* v. *Schooling*, 7 Nev. 15; *State* v. *Ross*, 20 Nev. 61; *Maynard* v. *Newman*, 1 Nev. 271.)

IV. "When the law is doubtful it is the duty of the court to adopt that construction which will be the least likely to produce mischief, and which will afford the most complete protection to all parties." (*Arnold* v. *Stevenson*, 2 Nev. 234; *Haydon* v. *Board of Supervisors*, 2 Nev. 371; *O'Neil* v. *N. Y. M. Co.*, 3 Nev. 141.)

V. "Statutes relating to the same subject matter, which can stand together, should be so construed as to make each effective." (*State* v. *Hoover*, 5 Nev. 141; *State* v. *Rogers*, 10 Nev. 319.)

VI. When a law is capable of two constructions without doing violence to the language used, courts should give it such construction as will be most beneficial to the public. (*Haydon* v. *Ormsby Co.*, 2 Nev. 371; *O'Neil* v. *N. Y. & S. P. M. Co.*, 3 Nev. 141; *Odd Fellows' Bank* v. *Quillen*, 11 Nev. 117.)

VII. The mining act of Congress, I contend, reserved all lodes from sale, having their top or apex outside of a patented mining claim, or an agricultural patent, and on its dip penetrating either the mineral patent or the agricultural patent.

VIII. Did the Central Pacific Railroad Company acquire title to that portion of the lode in controversy having its top or apex in section 33, with extralateral rights to the lode on its dip? If it did, Wedekind, the successor to the title acquired by the railroad company, became the owner of that portion of the lode in dispute. The respondent had been in possession of the lode in good faith under the Reno Star

location, long before and at the time that Bell purchased of Mrs. Conroy the land under which the lode dipped. If title was not acquired by the respondent, through the Central Pacific Railroad or by actual possession, but all of that portion of the lode on its dip passing into and under section 32 was still in the government, having been reserved from sale under the mining act of Congress, then the respondent acquired title to that portion of the vein lying west of the west line of section 33, under the Safeguard location. (*Del Monte M. Co.* v. *Last Chance M. Co.,* 171 U. S.)

By the Court, FITZGERALD, J.:

This case was argued and submitted, but before judgment was rendered the justices of the court were informed that the controversy between the plaintiff and the defendants had been settled. We subsequently had citation served on each of the counsel for the respective parties to the suit, that they appear before the court on a day named, and show cause why the case should not be dismissed for the reason that all controversy between the parties plaintiff and defendant as to the matter in litigation had ceased. On the day named, counsel representing each side of the case appeared before the court, and stated that all controversy between the parties had not ceased; but that only a part had been settled, and a part remained unsettled; and requested the court to take the case on to a judgment. Counsel then stated to the court exactly what had been done in the way of settlement between the parties plaintiff and defendant. On the facts stated, two questions arise: First, is all controversy between the plaintiff and defendants as to the property in suit settled? And, second, if settled, what disposition of this case should be made by this court?

Under the facts as stated to the court, we think all controversy between the parties as to the property in suit has been settled. Referring to the accompanying diagram, which is in all essential respects a copy of an exhibit in the case, to wit: plaintiff's map A, with the Reno Bell claim added, showing its easterly side line, line 9 (10 on the diagram)—one can understand the matter.

Plaintiff claimed under his Safeguard mining location, laid, as can be seen by inspection of the diagram, on four kinds of land, to wit:    (1) unpatented lands of the United States in section 28; (2) unpatented railroad lands in sec-

tion 29 belonging to plaintiff or under his control; (3) patented railroad land in section 33 belonging to plaintiff; and (4) lands patented, under desert-land applications, in section 32, belonging to defendants.    The matter in dispute

was the ore bodies under the surface of defendant's land in section 32. The plaintiff alleged that the said ore bodies had their "apex" on his land in section 33, and on his Safeguard mining location, partly lying on his said land in said section 33.

Plaintiff in his prayer for relief asked the judgment of the court that said ore bodies were his by reason of their "apex" being on his said land and claim; and also that defendants be perpetually restrained from interfering therewith.

On the hearing of the citation, it appeared that the plaintiff had conveyed to a third party, Mr. John Sparks, all of plaintiff's rights, title, and interest to the lands and ore bodies lying to the eastward of the easterly side line of the Reno Bell claim. Said easterly side line ran about 135 feet to the west of the ore bodies in dispute, said ore bodies being near the spot marked on the diagram. "Bell Shaft House"; northwesterly much further than the Safeguard location extended; and southeasterly considerably further than said ore bodies were shown to extend.

It further appeared that Mr. Sparks and the defendants had settled all of their contention; that it had been agreed that all suits between the parties except this suit in this court should be dismissed; and that whatever judgment this court might render in this case should have no effect on the said settlement, but that said settlement should in all respects stand, the judgment of this court to the contrary notwithstanding.

To us it seems clear: (1) That the plaintiff, Mr. Wedekind, has conveyed all of his right, title, and interest in the matter in controversy to a third party, Mr. Sparks; for the controversy was as to land and ore bodies lying to the eastward of said Reno Bell easterly side line, and nothing to the westward thereof was in controversy; and (2) that Mr. Sparks and the defendants have settled all of their dispute as to the matter in controversy, the defendants having conveyed all of their interest to Mr. Sparks. Of course, under the state of facts above mentioned, Mr. Sparks has become *dominus litis* on each side of the case; and, under the decisions of courts and in sound legal reason, the case should proceed no further for the want of *dominus litis* on each side thereof.

The following authorities support this doctrine:   *Little* v. *Bowers*, 10 Sup. Ct. 620, 33 L. Ed. 1016; *Henkin* v. *Guerss*, 12 East, 247; *Smith* v. *Railroad Co.*, 29 Ind. 546; *Board of Chosen Freeholders of Essex Co.* v. *Board of Chosen Free-holders of Union Co.*, 44 N. J. Law, 438; *McConnell* v. *Shields*, 1 Scam. 582; *Livingston* v. *D' Orgenoy*, 1 Mart. (O. S.) 96; *Meeker* v. *Straat*, 38 Mo. App. 239; *Judson* v. *Jockey Club*, 14 Misc. Rep. 350, 36 N. Y. Supp. 126; *Haley* v. *Bank*, 21 Nev. 127; and *State* v. *McCullough*, 20 Nev. 154.

On the hearing of the citation to show cause, the question was raised whether, after a case had been argued and submitted to the court for its decision and judgment, it could be disposed of without decision and judgment for the reason that the parties to the suit had settled it between themselves. We think it can, and should be.

In *Judson* v. *Jockey Club*, 14 Misc. Rep. 350, 36 N. Y. Supp. 126, cited above, and *Dudley* v. *Same*, (Com. Pl. N. Y.) 36 N. Y. Supp. 128, a case had not only been argued and submitted to the court for its decision, but the court had also rendered its judgment and decision, and the same had been entered of record; and yet, when the court obtained knowledge that the suit was fictitious, that there was not a *dominus litis* on each side thereof, it ordered its judgment and decision to be withdrawn from the files of the court.

In the first of the last two cases, on page 127, 36 N. Y. Supp., the court says:   "Courts of judicature are organized only to decide real controversies between actual litigants. When, therefore, it appears, no matter how nor at what stage, that a pretended action is not a genuine litigation over a contested right between opposing parties, but is merely the proffer of a simulated issue by a person dominating both sides of the record, the court, from a sense of its own dignity, as well as from regard to the public interests, will decline a determination of the fabricated case so fraudulently imposed upon it.   (*Lord* v. *Veazie*, 8 How. 255, 12 L. ed. 1067; *Cleveland* v. *Chamberlain*, 1 Black, 426; *Wood-Paper Co.* v. *Heft*, 8 Wall. 333; *Bartemeyer* v. *Iowa*, 18 Wall. 134, 135; *San Mateo Co.* v. *Southern Pac. R. Co.*, 116 U. S. 138; *Washington Market Co.* v. *District of Columbia*, 137 U. S. 62, 11 Sup. Ct. 4; *South Spring Hill Gold Min. Co.* v. *Amador Medean Gold*

*Min. Co.*, 145 U. S. 300, 12 Sup. Ct. 921; *Manufacturing Co.* v. *Wright*, 141 U. S. 696, 700, 12 Sup. Ct. 103; *California* v. *San Pablo & T. R. Co.*, 149 U. S. 308, 314, 13 Sup. Ct. 876; *Hoskins* v. *Lord Berkeley*, 4 Term R. 402; *In re Elsam*, 3 Barn. & C. 597; *Wood* v. *Nesbitt*, (Sup.) 19 N. Y. Supp. 423."

And in both cases, on the page following (page 128, 36 N. Y. Supp.), the court says: "The report of the referee shows that the controversy before the court was fictitious; that the transaction out of which it was supposed to grow—a horse race for stakes—was a pretended contest, arranged so as to form the basis of suits at law in which, without real adversaries before the court, an adjudication might be procured to use for other purposes than the enforcement of the right involved in the pretended suits. Upon the intervention of third parties having interests that might be affected by a decision in those proceedings, we ordered a reference to ascertain the facts (36 N. Y. Supp. 126); and, the report of the referee bearing out the contention of such parties, it only remains for us to dismiss the proceedings in this court growing out of the pretended and collusive transactions referred to. In addition to the cases already cited by us on the question of the right of third parties to intervene, we refer to the case of *Haley* v. *Bank*, in the Supreme Court of Nevada on March 10, 1891, reported in 12 L. R. A. 815, with note (s. c. 21 Nev. 127), in which it was held that an attorney, as *amicus curiæ*, may move to dismiss an action as collusive, and it is his duty to do so if he knows, or has reason to believe, that the action is fictitious. We shall, therefore, enter an order dismissing the appeal from the district court in the case of *Judson* v. *Jockey Club*, and the appeal and the action in this court in *Dudley* v. *Same Defendant*, and direct that the opinions of this court in those cases be withdrawn from the files, and that the costs of the reference be paid by the parties to those appeals. All concur."

We deem it proper to say here that the case before us is not in any objectionable or bad sense "fictitious." On the contrary, up to the time of the settlement thereof there was between the parties a very real contest, and the contest was very earnestly carried on. There is no possible blame attachable to any persons connected with the case. The settlement

of disputes amicably out of court instead of at arm's length in court is certainly commendable, and not blamable. But, as stated above, when the controversy between the parties litigant ceases, then the proceedings in court should follow its lead, and also cease.

It is ordered and adjudged that the case in this court is dismissed.